IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **UNITED STATES OF AMERICA**, <br><br> v. <br><br> **SHARAM AMIR SADEGHI** | **CRIMINAL ACTION** <br><br> **NO. 96-0013-KSM** |

MEMORANDUM

**MARSTON, J.**                                                                                                   August 2, 2022

In 1996, Petitioner Sharam Amir Sadeghi, an Iranian national, pled guilty to attempted robbery and impersonating a federal official. (Doc. No. 63 at 12.) On completing his sentence in 2001, Sadeghi was taken into custody for deportation proceedings. (*Id.* at 12–13.) Pursuant to the Convention Against Torture Act, the Board of Immigration Appeals ("BIA") deferred Sadeghi's deportation, but he is still required to report to the Immigration and Naturalization Service ("INS") for deportation annually. (*Id.* at 13–14.) The political circumstances in Iran remain unchanged, so Sadeghi has never been deported. (*Id.*) To avoid deportation and other consequences of his conviction, Sadeghi petitions the Court for a writ of *coram nobis* to vacate his conviction. (*See generally id.*) Sadeghi argues his conviction is invalid, as he was mentally ill at the time he pled guilty and the trial court erroneously failed to conduct a competency hearing. (*Id.* at 1.) The Government opposes the petition. (Doc. No. 66.) For the reasons below, Sadeghi's petition is denied.

**I.     BACKGROUND**

   **A.     *Sadeghi's Childhood and First Few Years in the United States***

Sadeghi was born in Iran and spent most of his childhood living with his family in Tehran. (Doc. No. 63 at 16.) When Sadeghi was a teenager, he "developed the delusional belief

that he was the Islamic version of the Messiah." (*Id.*)

Sadeghi received an F-1 student visa in 1993 and immigrated to the United States to study English as a Second Language at Temple University. (*Id.*) Sadeghi was still financially dependent on his father when he moved to the United States; however, during a visit to Philadelphia in 1995, Sadeghi's father told him that he "was an embarrassment to the family" and cut off all financial support. (*Id.*) After his father left, Sadeghi "fell into a depressive episode" and again began to develop delusions. (*Id.* at 17.) He believed the Iranian government was spying on him and wanted to "use him as a terrorist in the United States." (*Id.*)

### B. *Sadeghi's Crimes*

In late 1995, Sadeghi came to believe the CIA was using him "to interfere with or otherwise get rid of Iranians in the United States." (*Id.* at 18.) He believed he needed to accumulate precious jewels to lure Iranian agents to the United States to complete this mission. (*Id.*) Over a two-week period, Sadeghi made several trips to Safian & Rudolph Jewelers and offered to buy millions of dollars' worth of jewels. (*Id.*) Sadeghi, who claims he was delusional at these meetings, pretended to be someone else who could afford to buy valuable jewels: once he claimed to be a German doctor, another time he claimed to be the director of the CIA, and he always acted like he had the millions of dollars he would need to purchase the jewels. (*Id.*)

Safian & Rudolph alerted the FBI to Sadeghi's strange behavior, and they set up a sting operation to deliver a suitcase full of "diamonds" to Sadeghi. (Doc. No. 63, Ex. B at 23–24.) Sadeghi met undercover agents at a hotel in Philadelphia and was arrested. (*Id.*) At the time of his arrest, Sadeghi had a hatchet and pellet gun on his person and was carrying forged credentials from the CIA, the Navy, and the Department of State. (*Id.* at 24.) Sadeghi was charged with

2

attempted robbery and impersonating a federal officer.[1] (Doc. No. 63 at 20.)

### C. Sadeghi's Guilty Plea and Sentencing

L. Felipe Restrepo, now a judge for the U.S. Court of Appeals for the Third Circuit, represented Sadeghi. (*Id.* at 22.) Sadeghi initially pled not guilty; however, in March 1996, after entering into a written plea agreement with the Government, he changed his plea to guilty. (*Id.* at 20.) At the change of plea hearing, the Honorable Louis H. Pollak asked Sadeghi about his background, his medical history, and the crimes to which he was pleading guilty. (Doc. No. 63, Ex. B at 2:14–8:22.) Sadeghi answered these questions cogently, admitted that he committed the crimes charged, and confirmed that he understood the consequences of his guilty plea. (*Id.* at 29:13–80:17.) Satisfied with Sadeghi's response—and raising no doubts about Sadeghi's competency, Judge Pollak accepted Sadeghi's guilty plea. (*Id.* at 31:18–21.)

Sadeghi was sentenced in July 1996. (Doc. No. 63 at 20.) The presentence report indicated that Sadeghi sought counseling for suicidal ideations while in custody, but the therapist told him he was "OK" and "not suicidal." (Doc. No. 63, Ex. J at 184.) Saedghi did not object to this finding, and his mental health was not a key focus of the sentencing hearing. (*See generally* Doc. No. 63, Ex. C.) Rather, the bulk of the hearing focused on whether Sadeghi intended to harm anyone in connection with the attempted robbery. (*Id.*) At one point, Sadeghi, a new English speaker at the time, confused the words "rob" and "harm." (*Id.* at 10–14.) He said he had not intended to "rob" anyone, but he meant to say he had not intended to "harm" anyone. (*Id.*) After a brief discussion, Sadeghi's counsel clarified the confusion:

---

[1] Sadeghi's delusions continued after his arrest. (Doc. No. 63 at 19.) He contacted the FBI and offered information on what he believed to be pending terrorist attacks by Iranians. (*Id.*) Given this intel, Sadeghi claims he "fully expected that the FBI would intervene to halt [his criminal] proceedings," but the FBI found no merit to his claims and declined to intervene. (*Id.*)

> THE COURT: Please sit down. I understand we're ready to resume.
>
> MR. RESTREPO: I hope so, Judge. Thank you for the opportunity to talk to my client. In essence, I think what the confusion was [was] Mr. Sadeghi's interpretation of the terms "harm" and "rob." He does not dispute the fact that: yes, he did intend to make off with the goods had he been given the opportunity."
>
> THE COURT: . . . Mr. Sadeghi, you've heard what Mr. Restrepo said on your behalf. Do you agree with what he said?
>
> MR. SADEGHI: Yes.
>
> THE COURT: Mr. Restrepo was speaking for you, is that right?
>
> MR. SADEGHI: Yes.
>
> . . .
>
> THE COURT: All right. I want to be sure of that because you were starting to say things before[] we recessed that sounded different. But you're satisfied with [what] Mr. Restrepo has just said; is that right?
>
> MR. SADEGHI: . . . I wasn't trying to change nothing that [I] have said before in the court, Your Honor.

(*Id.*)

Judge Pollak sentenced Sadeghi to 60 months' imprisonment and three years' supervised release and was assessed $15,000.00 in fines. (Doc. No. 63 at 20.) He also ordered Sadeghi to attend a "therapeutic mental health treatment program" during his supervised release. (Doc. No. 63, Ex. C at 25.) Sadeghi's sentence was affirmed on appeal. (Doc. No. 63 at 12–13.)

### D. *Sadeghi's Incarceration*

Sadeghi claims his mental health further declined while he was incarcerated, in part because "[h]e believed the government had betrayed him and breached their agreement by failing to protect him." (*Id.* at 24.) Sadeghi filed several *pro se* lawsuits while incarcerated, alleging that he had an agreement to serve as an informant for the FBI, but the FBI reneged on its

promises, thereby violating his constitutional rights and putting his life in danger.[2] (*Id.*)

### E.  Sadeghi's Post-Release Mental Health

In 2002, Sadeghi was released from prison, and consistent with Judge Pollak's order at sentencing, he submitted for a psychological examination. (*Id.* at 26.) A psychiatrist examined Sadeghi and did not diagnose any mental illness or recommend any mental health treatment. (*Id.*) In 2014, Sadeghi's primary care physician diagnosed him with a generalized anxiety disorder. (*Id.*) And in 2016, Sadeghi was diagnosed with schizoaffective disorder. (*Id.*) Sadeghi manages his diagnosis through a combination of psychotherapy and psychiatric medication. (*Id.*)

At a psychotherapy session in 2019, Sadeghi's treating therapist suggested that "the acts [for] which he was convicted [were likely] caused by a psychotic episode." (*Id.* at 27.) Sadeghi consulted with Dr. Zachary Torry, a forensic psychiatrist. (*Id.*) After several meetings with Sadeghi and a review of the records related to his criminal conviction, Dr. Torry opined that there was "a causal relationship between [Sadeghi's] psychosis and the criminal acts." (Doc. No. 63, Ex. K at 30.)

### F.  Sadeghi's Life Post-Release

Despite his diagnoses, Sadeghi has lived a full life since his release. He has completed 16 hours of graduate coursework at Temple University and the Executive Management Program at Harvard University.[3] (*Id.* at 30.) In 2006, he proposed to his girlfriend, and the two married in

---

[2] *See United States v. Sadeghi*, No. 96-cr-0013 (E.D. Pa. 1997) (motion to set aside sentence under 28 U.S.C. § 2255); *Sadeghi v. Reno*, No. 98-cv-1127 (E.D. Pa. 1998) (action seeking to enjoin deportation from the United States based on a purported (but non-existent) agreement with the FBI); *Sadeghi v. United States*, No. 99-cv-0403 (Fed. Cl. 2000) (seeking damages for FBI's breach of purported (but non-existent) agreement); *Sadeghi v. Beeler*, No. 99-cv-5337 (D.N.J. 1999) (seeking injunction against deportation).

[3] Additionally, while incarcerated, Sadeghi completed distance learning courses at Cornell

2017.  (*Id.*)  Sadeghi's mother, an Iranian refugee, immigrated to the United States and became a naturalized citizen in 2021.  (*Id.*)  Sadeghi's mother lives with Sadeghi and his wife and relies on Sadeghi for financial support and medical care.  (*Id.*)

### G. *Sadeghi's Immigration Status*

In 2001, prior to his release from custody, the BIA ordered Sadeghi be deported to Iran but indefinitely deferred his deportation under the Convention Against Torture Act.  (*Id.* at 13.)  Accordingly, he was not immediately deported upon his completion of supervised release (which he served in an immigration detention facility), but instead was released into the community and must report to an INS office for deportation annually.  (*Id.* at 13–14.)  Sadeghi has reported for deportation every year for the past 19 years but has yet to be deported "[d]ue to lack of changed political circumstances in Iran."  (*Id.* at 14.)  He believes deportation would essentially be a death sentence, as "he is wanted in Iran as an 'enemy against God' and for treason."  (*Id.*)

To avoid the possibility he might one day be deported, Sadeghi petitions the Court for a writ of *coram nobis* to vacate his sentence.  (*See generally* Doc. No. 63.)

## II.  LEGAL STANDARD

*Coram nobis* is an "extraordinary remedy" that allows individuals to attack allegedly invalid convictions where they are no longer "in custody" but continue to suffer consequences from their convictions.  *See United States v. Morgan*, 346 U.S. 502, 511, 513 (1954).  The Supreme Court has explained that "it is difficult to conceive of a situation in a federal criminal case today where the writ of *coram nobis* would be necessary or appropriate."  *Carlisle v. United States*, 517 U.S. 416, 429 (1996) (quoting *United States v. Smith*, 331 U.S. 469, 475 n.4 (1947)).  In fact, in order to preserve judicial interests in finality and efficiency, "[t]he standard for

---

University.  (Doc. No. 63, Ex. K at 30.)

obtaining *coram nobis* is more stringent than that applicable on direct appeal or in habeas corpus." *Ragbir v. United States*, 950 F.3d 54, 62 (3d Cir. 2020) (quoting *United States v. Rhines*, 640 F.3d 69, 71 (3d Cir. 2011)). *Coram nobis* relief is available only to remedy errors "of the most fundamental character—the kind that renders the proceeding itself irregular and invalid." *Id.*

    A petitioner must satisfy five prerequisites for *coram nobis* relief. *Id.* He must

        (1)    No longer be in custody;

        (2)    Suffer continuing consequences from the purportedly invalid conviction;

        (3)    Provide sound reasons for failing to seek relief earlier;

        (4)    Have had no remedy available at the time of trial; and

        (5)    Assert an error of the most fundamental kind.

*Id.*; *see also United Sates v. De Castro*, CRIMINAL ACTION NO. 15-CR-114, 2021 WL 4149150, at *2 (E.D. Pa. Sept. 13, 2021) (applying the *Ragbir* factors). The petitioner bears the burden of showing the five prerequisites are satisfied. *See Ragbir*, 950 F.3d at 62.

## III. ANALYSIS

    The Government concedes the first two factors are satisfied, but the parties dispute the third, fourth, and fifth factors. (Doc. No. 66 at 4.) We consider each of the remaining disputed factors in turn.

### A. *Sound Reasons for Delay*

    A petitioner is not required to challenge his conviction at the earliest opportunity, but he must offer "sound reasons" for failing to do so. *Ragbir*, 950 F.3d at 63. This is an exacting standard designed to balance interests in finality and equity. *Id.* at 62. "[T]he more time that elapses between a party's conviction and his petition for *coram nobis*, the less likely it becomes

that sound reasons exist." *Id.* (quoting *United States v. Kwan*, 407 F.3d 1005, 1014 (9th Cir. 2005)). Sadeghi was convicted in 1996 but did not petition this Court for a writ of *coram nobis* until 2022. He attributes this delay to undiagnosed mental illness: he was not diagnosed with schizoaffective disorder until 2016, and he did not draw a nexus between his diagnosis and his conviction until 2019. (Doc. No. 63 at 35.) These are not "sound reasons."

Mental illness may be a sound reason for a delay in attacking a conviction where it renders a petitioner incapable of "evaluat[ing] the need for and prospects of *coram nobis* relief." *See Nicks v. United States*, 835 F. Supp. 151, 155 (S.D.N.Y. 1993); *see also id.* at 155 (holding that the petitioner's mental illness was a sound reason for delaying a *coram nobis* petition, as the petitioner was consistently severely mentally ill from the time of his trial through the time of his petition). However, later-diagnosed mental illness is not a sound reason for delay unless there is evidence the mental illness kept the petitioner from *ever* being able to assess the need for *coram nobis* relief. *See United States v. Banks*, 694 F. App'x 61, 62 (3d Cir. 2017) (affirming the district court's holding that a later-in-time finding of incompetency was not a sound reason for failing to seek *coram nobis* relief earlier).

Sadeghi's mental illness is not a "sound reason" for his delay, as there is no evidence that any illness from which he may have suffered rendered him incapable of assessing the need for *coram nobis* relief from the time of his conviction on.

Dr. Torry's report opines that Sadeghi suffered from a mental illness when he committed the attempted robbery and that "there was a reasonable cause to doubt [Sadeghi's] competency during both the criminal and sentencing hearings." (Doc. No. 63, Ex. G at 31–32; Doc. No. 63, Ex. K at 2–3.) But, as discussed below, *see supra* Section III.C, the contemporaneous evidence shows that Sadeghi did not present as incompetent at either hearing. *See United States v.*

*Woodruff*, Criminal No. 95–cr–77–JD, 2012 WL 6587354, at *1 (D.N.H. Dec. 17, 2012) ("Woodruff does not adequately explain the delay in seeking relief from judgment. . . . The colloquies between the court and Woodruff at his change of plea hearing and his sentencing hearing demonstrate that Woodruff was not disabled by mental illness and that he understood the plea agreement and the nature of the proceedings."); *United States v. Foster*, Criminal No. 1:CR-94-071-02, 2006 WL 2588706, at *2–3 (M.D. Pa. Sept. 8, 2006) (holding there were no sound reasons for the petitioner's delay even though the petitioner claimed to have been mentally ill at the time of his trial).

There is also no evidence that Sadeghi suffered from a mental illness—let alone a mental illness that rendered him incapable of evaluating whether to attack his conviction—upon his release from prison. In fact, in 2002, shortly after his release, Sadeghi underwent a court-ordered psychiatric examination, and he was not diagnosed with any mental illnesses. (Doc. No. 63 at 26.) Since his release, Sadeghi has maintained steady employment, working as a dishwasher, managing a homeless shelter, and consulting on human resources in the medical field. (Doc. No. 63, Ex. G at 13.) He has also completed the Executive Management Program at the Harvard Kennedy School of Government and coursework at Temple University Beasley School of Law. (*Id.*) And, in 2017, after a 12-year engagement, he married his fiancée. (*Id.* at 14.) Sadeghi's employment history, educational pursuits, and ability to maintain a long-term relationship suggest that he has been competent and capable of evaluating the need for *coram nobis* relief since he was released from prison. *See United States v. Wilson*, CRIMINAL ACTION NO. 5:98-cr-13-DCB-1, 2020 WL 3051250, at *3 (S.D. Miss. June 8, 2020) (holding that the petitioner's purported mental illness was not a sound reason for his fifteen-year delay in filing, as the petitioner failed to produce evidence of incompetence and had proven himself competent

earlier through articulate court filings).

Even assuming *arguendo* that Sadeghi was not capable of evaluating his conviction until after his diagnosis in 2016, he offers no "sound reason" for failing to petition for relief until 2022. He claims he could not have filed the petition until 2022 because he only first made the connection between his mental illness and his conviction at the suggestion of a psychotherapist in 2019. But this does not excuse Sadeghi's delay in filing—he should have made this connection on his own in 2016. He reported for deportation annually (a direct consequence of his conviction) and had the foresight to inform his mental healthcare providers of his arrest and conviction, so he should have—and likely did—realize his mental illness may have caused him to attempt to rob Safian & Rudolph. (Doc. No. 63 at 27.) *Cf. Hugueley v. Carpenter*, No. 09–1181–JDB–egb, 2015 WL 225053, at *16–18 (W.D. Tenn. Jan. 15, 2015) (holding, in the habeas context, that the petitioner's competency claims were untimely because even though the petitioner confirmed that he had certain "brain defects" through a brain imaging in 2013, he had known of his competency issues for years before that).

There is no evidence Sadeghi was unable to assess the validity of his conviction at any point in the 25 years between his guilty plea and the time he filed this petition. And even viewing the evidence in the light most favorable to Sadeghi and assuming that he had no reason to question his conviction until he was diagnosed with schizoaffective disorder in 2016, he still waited six years to file this petition. Sadeghi has thus failed to identify "sound reasons" for his delay, so *coram nobis* relief is not available. *See Ragbir*, 950 F.3d at 66 ("[W]e conclude that Ragbir had the ability to bring all his claims at least six years before his 2012 petition for coram nobis. He provides no sound reason for his delay."); *Mendoza v. United States*, 690 F.3d 157, 160 (3d Cir. 2012) (finding a four-year delay barred *coram nobis* relief where there were no

changed circumstances justifying the delay).

### B. *Remedy Available at the Time of Trial*

Although Sadeghi failed to offer sound reasons for his delay, we will consider whether he satisfies the other prerequisites for completeness' sake.

The fourth prerequisite to *coram nobis* relief requires there have been no remedy available to the petitioner at the time of trial. *Ragbir*, 950 F.3d at 63. In assessing this factor, courts are to "focus[] on whether a party was unable to make certain arguments at trial or on direct appeal." *Id.* Courts most frequently find this prerequisite satisfied where a retroactive change in the law affords the petitioner new legal arguments not available at the time of his trial. *See, e.g.*, *De Castro*, 2021 WL 4149150, at *3.

Sadeghi argues he could not seek a competency hearing "at the time of his criminal proceedings or on direct appeal because he was evidently incompetent and had no understanding of his mental illness." (Doc. No. 63 at 38.) We agree. Assuming Sadeghi had been incompetent, he cannot be expected to have requested a competency hearing during his trial, nor can he be expected to have challenged the trial judge's and his counsel's decision not to call for a competency hearing. *See Medina v. California*, 505 U.S. 437, 449–50 (1992) ("[I]t is . . . contradictory to argue that a defendant who may be incompetent should be presumed to possess sufficient intelligence that he will be able to adduce evidence of his incompetence." (internal quotations omitted)).

### C. *Fundamental Error*

Even though there was no remedy available for Sadeghi at the time of trial, *coram nobis* relief is unavailable because the trial court did not err in failing to order a competency hearing. The "fundamental error" prerequisite is two-pronged: "there must be an error, and the error must

11

be fundamental." *Ragbir*, 950 F.3d at 63.  A trial court's failure to order a competency hearing where one is constitutionally required is a "fundamental error."  *See Nicks v. United States*, 955 F.2d 161, 167 (2d Cir. 1992) (citing *Drope v. Missouri*, 420 U.S. 162, 172 (1975)); *see also Cherys v. United States*, 552 F. App'x 162, 169 (3d Cir. 2014) ("Conviction of a legally incompetent person violates the Due Process Clause." (internal citation omitted)).  But Sadeghi does not assert a fundamental *error*, as Judge Pollak's decision not to order a competency hearing was not erroneous.

Due process requires a trial court to order a competency hearing *sua sponte* if, at any time prior to sentencing, "there is reasonable cause to believe that the defendant may presently be suffering from a mental disease . . . rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense."  18 U.S.C. § 4241(a).  In evaluating a defendant's competency, a court must consider a number of factors, including "evidence of a defendant's irrational behavior, his demeanor at trial, and any prior medical opinion on competence to stand trial."  *United States v. Leggett*, 162 F.3d 237, 242 (3d Cir. 1998) (internal quotation omitted).  Another relevant factor is "an attorney's representation about his client's competency."  *United States v. Renfroe*, 825 F.2d 763, 767 (3d Cir. 1987) (internal citation omitted).  The presence or absence of any factor is not dispositive.  *Id.*  Ultimately, a court's analysis turns on whether the defendant "(1) has the capacity to assist in her or his own defense and (2) comprehends the nature and possible consequences of a trial."  *United States v. Jones*, 336 F.3d 245, 256 (3d Cir. 2003) (quoting *Leggett*, 162 F.3d at 242).  "If either prong is not met, a court has reasonable cause to order a competency hearing."  *Id.* at 256–57.

Here, there was no prior medical opinion that Sadeghi was incompetent to stand trial, and

Sadeghi's attorney (now-Judge Restrepo) did not raise any issues with Sadeghi's competency. Nevertheless, Sadeghi argues the trial court should have ordered a competency hearing for three reasons: (1) the presentence report indicated that he had suicidal ideations; (2) his behavior at the change of plea and sentencing hearings was so bizarre that Judge Pollak should have known Sadeghi was incompetent; and (3) Judge Pollak himself recognized Sadeghi's incompetence. (Doc. No. 63 at 41–42.) On the Court's independent review of the record, the Court finds there are no facts that should have alerted Judge Pollak to any need for a competency hearing.

As to Sadeghi's first argument, the fact that the presentence report mentioned that Sadeghi was suicidal was not enough, on its own, to create reasonable cause for a competency hearing. Reference to a defendant's suicidal ideations does not require an inquiry into the defendant's competency. *See, e.g.*, *Layne v. Moore*, 90 F. App'x 418, 423 (3d Cir. 2004) (affirming finding that there was no reasonable cause for a competency hearing even though the defendant was on "a powerful narcotic . . . to prevent him from committing suicide" where the defendant's records "did not mention insanity or diminished capacity"); *see also, e.g.*, *United States v. Neal*, 776 F.3d 645, 656 (9th Cir. 2015) (affirming finding that there was no reasonable cause for a competency hearing where the defendant had previously attempted suicide and was receiving "psychiatric help"); *Lopez v. Walker*, 239 F. Supp. 2d 368, 374 (S.D.N.Y. 2003) ("Lopez's pre-sentence report made reference to his prior suicide attempts . . . . This evidence alone did not require the court to make a further inquiry into Lopez's competency.").

And as to Sadeghi's second argument, although his behavior may have been odd at the change of plea and sentencing hearings, there was no indication he was unable to assist his counsel, unable to comprehend the nature of the proceedings, or unable to understand the possible consequences of a guilty plea. *See Jones*, 336 F.3d at 256.

Sadeghi was able to assist in his own defense. The transcripts from the hearings are replete with examples of Sadeghi assisting his counsel with his representation and defense. (*See, e.g.*, Doc. No. 63, Ex. B at 26:8–18 (Sadeghi and his counsel conferring before his counsel responded to the government's recitation of its case against Sadeghi); *id.* at 26:12–17 (Sadeghi clarifying, through his counsel, that he had a slightly different memory of certain facts than the Government recounted); Doc. No. 63, Ex. C at 8:9–10 (Sadeghi and his counsel conferring about Sadeghi's conflation of the terms "rob" and "harm"); *id.* at 9:14–10:19 (indicating that Sadeghi and his counsel had an extended conference to confirm that Sadeghi was not withdrawing his guilty plea and clarifying the intent behind Sadeghi's statements in his colloquy with Judge Pollak).) Notably, at the change of plea hearing, Sadeghi clarified to the Court that he never intended to kill anyone but was in a "depression situation" and was "prepared to die, not to fight with anyone to death." (Doc. No. 63, Ex. B at 27:14–25.) Neither before, nor during, nor after any of these conversations with Sadeghi did Judge Restrepo raise any concerns about Sadeghi's capacity, and "who but the defendant's attorney knows best if the accused is able to assist in his own defense?" *See United States v. Morgano*, 39 F.3d 1358, 1374 (7th Cir. 1994); *see also Renfroe*, 825 F.2d at 767.

Sadeghi also understood the nature the proceedings. The colloquy at the change of plea hearing demonstrates that he understood the nature of the hearing. Judge Pollak asked Sadeghi about his family, education, and immigration status (Doc. No. 63, Ex. B at 5:12–8:21), and Sadeghi provided "clear, unequivocal" answers. *See Rhoades v. Smith*, CIVIL ACTION NO. 18-235, 2020 WL 1694597, at *6 (E.D. Pa. Apr. 7, 2020). Sadeghi also expressly confirmed that he "underst[oo]d [the] proceedings" and "underst[oo]d what's going on." (Doc. No. 63, Ex. B at 8:18–21.) And, although Sadeghi reports having experienced delusions during the commission

14

of his crimes, there is no indication he continued to experience delusions rendering him incapable of comprehending the change of plea or sentencing hearings: at no point during either hearing did Sadeghi claim to be a CIA agent, and when Judge Pollak asked if he worked for the CIA, Sadeghi confirmed that he did not.[4] (Doc. No. 63, Ex. B at 30:4–6.)

Sadeghi likewise understood the possible consequences of a guilty plea. Judge Pollak clearly explained the consequences Sadeghi might face if he pled guilty: He explained that Sadeghi could be sent to prison for up to 23 years and could be fined $100. (*Id.* at 8:22–9:6.) He explained that Sadeghi was giving up "very valuable constitutional rights to a trial." (*Id.* at 12:13–14.) And Sadeghi confirmed that he understood he could face a lengthy prison sentence and was giving up a "whole array of constitutional rights" in connection with his guilty plea. (*Id.* at 16:17–21.)

Finally, as to Sadeghi's third argument, Judge Pollak never raised doubts about Sadeghi's competence. Sadeghi argues Judge Pollak first doubted Sadeghi's competence near the beginning of the sentencing hearing. (*Id.*) Judge Pollak said he was "having considerable difficulty . . . understanding what [Sadeghi was] trying to tell [him]." (Doc. No. 63, Ex. C at 7:20–21.) Sadeghi had testified that he "had no intention of robbery," which differed from his testimony at the change of plea hearing that he had intended to rob Safian & Rudolph. (*Id.* at 8–9.) After a brief recess, his counsel clarified that Sadeghi had "misinterpret[ed] the terms 'harm' and 'rob' and applying them in the wrong context." (*Id.* at 10:16–11:24.) Judge Pollak was satisfied with the clarification and confirmed that Sadeghi agreed with it. (*Id.* at 13:23–14:6.)

In deciding whether to grant *coram nobis* relief, "it is presumed that the prior proceedings

---

[4] The fact that Sadeghi may have experienced delusions at the time of the attempted robbery has no bearing on whether he was competent to offer a guilty plea—the relevant inquiry is "the defendant's mental state *at the time of the proceedings*." *Leggett*, 162 F.3d at 244 (emphasis added) (cleaned up).

15

were properly conducted," and "[t]he petitioner has the burden to show otherwise." *Ragbir*, 950 F.3d at 62. Given this presumption, the Court must presume that Judge Pollak's "difficulty . . . understanding" was driven by Sadeghi's confusion of the words "harm" and "rob." Sadeghi was a new English speaker, and his counsel clarified any confusion to the satisfaction of Sadeghi and Judge Pollak. Sadeghi has not offered any evidence that Judge Pollak expressed confusion here because he thought Sadeghi incompetent, and we cannot presume otherwise.

Sadeghi also contends that Judge Pollak's statements near the end of the sentencing hearing illustrate that he had concerns about Sadeghi's competency. Judge Pollak said,

> This is a case in which separating what is real from what is in the realm of fantasy is not an easy matter. But it appears to be irreducibly true that Mr. Sadeghi undertook to take from the Safian & Rudolph Jewelry Store some hundreds of thousands of dollars' worth of diamonds. And it is irreducibly true that in aid of this enterprise, he represented himself as a high-up agent of the CIA and spun a story of wanting these diamonds.

(Doc. No. 63, Ex. C at 20:5–14.) Again, the Court must presume that the prior proceedings were valid. *Ragbir*, 950 F.3d at 62. Thus, the Court must presume the "realm of fantasy" to which Judge Pollak referred was the fantasy world Sadeghi crafted to carry out the attempted robbery—the one in which he posed as a German doctor and a CIA agent and claimed to have created bank accounts and wired assets to steal diamonds from Safian & Rudolph. Sadeghi has offered no evidence to rebut this presumption.

There is no evidence there was any reasonable cause for Judge Pollak to have inquired into Sadeghi's competency at the time of the change of plea or sentencing, so his decision not to order a competency hearing was not in error. Because there was no "error," Sadeghi has not asserted a "fundamental error" and is not entitled to *coram nobis* relief.

\*   \*   \*

Sadeghi has not offered sound reasons for his delay, nor has he asserted a fundamental

16

error.  Accordingly, he has not satisfied the prerequisites for *coram nobis* relief, and his petition must be denied.

## IV.    CONCLUSION

For the reasons above, Sadeghi's petition is denied.  An appropriate Order follows.